Please call the next case. Our last case today is 5-13-0598. So we'll proceed with Public Waste and CCMSI v. David Summers and Kevin Leahy for the Appellant and Mary Massa for the Affiliate. Thank you, Your Honor. May it please the Court. Kevin Leahy on behalf of the Appellant and Public Services. First, I apologize for my appearance. I had an illustration of Janet Jackson, a wardrobe malfunction. I'm appearing from jeans and I don't normally do that. I hadn't noticed. It was a distraction preparing for oral argument. Pretending it was modern wardrobe, like the modern footwear. Meaning no disrespect. Before this Court, we understand and we're here to argue the collection of cases of neutral risk. We understand the burden of manifest way of the evidence. I will limit it, at least in the initial argument, for the time constraints. We feel that the Commission and its decision and the findings of the fact are wrong and they're in error and they're not supported. And I direct one sentence to this Court. The reason that they found this case compensable is because the arbitrator determined on the initial decision in the first paragraph that the 44-year-old diesel mechanic, quote, as he was positioning the torque rod, he twisted and felt a pop in his back and immediately felt pain in his low back. That is what they determined, the Commission affirmed, and what we're asking this Court to overturn. That's not the evidence. That's not what this petitioner wrote down. It's not in his handwritten notice of what occurred. And we think it's a simple neutral risk. If you go to page 40 in the transcript, that's the cross-examination of his handwritten statement. You know the facts, but it's so important to emphasize the chronology. He worked that whole day doing his shift. He woke up the next morning with severe back pain. He already had an appointment scheduled with his private care physician. He went to the care physician for other reasons, but he then said, he added on, you know, I'm having back pain today. And he told the care physician about the back pain he was experiencing from the previous day. And the care physician then, after that, something you can infer, and they can logically infer, it's fine, to say, well, you ought to go back and report it. And he does go back and report it. And he reports it, and it's in our brief, in his note. It is written in his handwriting. He says, and I quote, on page 40 of this, I'll just, you have it written, it's Exhibit 8, Respondents' Exhibit 8, in its own handwritten note. And it's dated, he's got two dates, the 4th. The event of the accident or the onset of the back pain was the 4th. He wrote this note when he came back to the employer on the 5th. This is the note that was contemporaneously made in time with his memory, everything that we rely on as officers of the court. And he stated in his writing, when I stood up from installing slats on Vehicle 302, I feel some discomfort in my lower left side of my back. As the night went on, it got worse. By the time I change out of my work clothes, it was more discomfort. And by 2 a.m., I was, I could not move to get out of bed without severe pain in my back. When did this accident occur? It occurred at work on the 12th. What was the date? October the 4th. He was at work on October the 4th. What he is reporting in a handwritten statement on the 5th is that's the some discomfort that he felt the day before. Right. So you're parsing, obviously he said he felt the problem in his back, and you're saying because he didn't state he felt the pop, the case turns on that. Is that what you're saying? I think it's huge. I think that's very important. But I can't win, I don't think, on that alone. I may not win. Right, because it's up to the commission to weigh any alleged inconsistencies in the testimony. Is that inconsistent? Yeah. Huge, huge inconsistency. Okay. Because the first time he ever mentioned a, quote, pop was two months later to a doctor. Okay, now let's talk about that pop. What did he say in regard to that pop on the creeper? Did he say that the pain started instantly? He has three different scenarios of accident theories. One is handwritten of some discomfort. One, he was on a creeper board underneath when he said he felt a pop. And a third scenario when he was not laying prone, but he was actually standing and leaning over a hood, and he was in the process of standing up. But does he say anything mutually exclusive about an injury to the back? No. If I understand you correctly, there's no mutual exclusive one event. Or there's no mutually exclusive statement by him that he didn't hurt his back, he hurt some other body part or something. He always, right after the accident, complained about at least some discomfort or problem in his back, correct? Correct. Okay. And we have nothing to refute that he didn't experience some discomfort at work on the fourth. I have no doubt. I mean, how high of a standard do we have to hold an injured worker to in reporting the exact same thing? You read his statement here, and I read along with you. And you were very charitable in going over all the misspelled words and interpreting what they are and everything. Obviously, this is not a highly educated person. And that's a great question. I mean, there's a point at which we are nitpicking. Absolutely. And if you'll notice, this is why my employer gives them the benefit of the doubt. It actually did offer those benefits initially. The treatment, they thought it was a back problem, minor back spasm. And to this day, I'll end up my argument later saying, you know, we still don't know what it is. But to your question, you're right. I thought exactly if I was a judge, I'd say, come on. Some of these people are just workers and aren't highly educated, et cetera. So I'm giving him the benefit of the doubt. And the point is we're setting the precedent for when is something, a work accident arising out of an accords of employment, and when isn't it? I think the evidence in this record establishes unequivocally that all this gentleman correctly reported was he was in the process of straightening up when he felt the onset of some discomfort. I'm not offering, I am discrediting this idea. He didn't testify to that. That's your interpretation of it. Oh, that's his handwritten statement. That's the onset. That's where I'm trying to go, and I'd like to let you finish here with what you're saying. Because I will, to his point, to Justice Stewart's point, you don't have to be educated to say, I hurt. I had a sudden onset of pain. I had severe onset. I hurt. I was breathing. All the other scenarios we encounter when we read cases and read histories in medical reports. We don't have a popping in his case. We don't have an onset of severe pain at work until two months is the popping, and the rest is a residual on and off spasm in back pain to the doctors, which they provide palliative care and therapy. And then, so staying on this point, that I think it's a big distinction in his words, that he didn't have onset of severe pain, that it really began the next morning when he couldn't get out of bed, and everything snowballed from there. Anticipating a question. Yeah, and I'm confused by your neutral risk. He testified, did he not, at the 19B hearing on March 27, 2013. He was a 45-year-old diesel mechanic. Tell me where I'm wrong. He'd been employed by the respondent for a little over eight years. He testified on October 4, 2011. He was working under a vehicle using a creeper at that time, and he felt a pop in his back. That's what he testified to before the arbitrary, correct? Yes. So what is this neutral risk theory? Well, on cross-examination on page 40, you'll see that he admits, when I crossed him, there was no pop. What's that got to do with the neutral risk, whether it was a pop or not? So then the neutral risk is he's standing up from a neutral position doing a normal activity of life. He said he was under a vehicle working on a creeper. What's this about standing up? His statement doesn't support under the creeper theory. It's wrong. That's why we're here. That one sentence is wrong. That's not an injury. He never sustained a work-related injury. What he sustained was the onset of some discomfort at work. That's his testimony. That's unrefuted, but that's not an accident, and it's not an injury that's compensable under the Illinois War Compact. To sustain some discomfort is not an accident or injury. Don't we have testimony here to parse it out that he felt a pop? Okay, is that correct? Correct. Let him answer. That he felt a pop. Then we have this statement that said, when I straightened up, I felt pain. Is that true? I don't buy that that's the chronological event of the emergency. I think the pop was clear. Is that not the evidence in the record? I would say that you could interpret that, but I will say that my cross-examination refuted that line of accident theory. He said he didn't have a pop in his cross, and it's not in his written statement. And he said my reading of his statement in cross-examination was true and accurate, and he went to the doctor the next day. He didn't mention a pop or sudden onset of pain to his own physician. He didn't mention that pop or sudden onset of pain that this case has now been made compensable for two months. And I'm arguing that the record's wrong, the commission's wrong. You can't base an injury on an erroneous statement that has been refuted in the record. Even though he testifies under oath that this happened.  You're picking and choosing. He told your expert, did he not? What's his name? Logan was the doctor. Our IME expert was David Lang. Didn't he tell Lang that he felt a pop? Dave Loesch was the witness. Didn't he tell somebody there in the record also he felt a pop on his back? Yeah, he did tell them that. I'm not disagreeing with you. So you're pointing out inconsistencies. You're saying this is ridiculous. He didn't report the pop for two months. He didn't do this. He didn't do that. Who decides the credibility of the claimant? We do or the commission does? The commission does. Okay. And I acknowledge. You're saying it's so inherently ridiculous that they couldn't have believed it. I'm saying that the manifest way to the evidence, they're basing it now on speculation and conjecture because you can't have a case of compensability based on a false fact. Or you shouldn't have. Let me ask you this. Give me your honest answer to this question. Let's assume he never said anything about a pop for five years. He gets up on the witness stand before the arbitrator and says, I felt a pop in my back on the date of the accident. You're saying that the commission couldn't believe that and couldn't find it in his favor because he never said anything until then. It has to be your position, right? Wrong. I'm not saying they couldn't believe that. They certainly can't believe it. They are free to believe any and everything that is presented before them. If a person testifies in direct examination, X happened, but in cross-examination it's X never happened, that the finder of fact cannot find X actually happened. Well, under our review, standard of review theory, it's up to this court and that's why we're here. Mistakes happen. And if you review this transcript in total and you believe that this is wholly against the manifest weight of the evidence, in that nobody would believe that he would suffer a pop or that he suffered a traumatic injury to his back rather than an insidious onset from standing up, which, again, I emphasize was some discomfort, not pain. What did he admit on cross-examination? There was no pop. Pardon me?  There was no pop. Is that correct? Correct. Page 40 and 41 is the cross-examination. That's my argument. And I know how narrow this is and I know how difficult it is for us to overcome this burden. Let me change to the alternative in that this gentleman then went back to work after the initial round of treatment and was released and returned to work on February 20th by his selected treating physician, Dr. Gornet. Full duties, no restrictions. And then our alternative argument is we are being asked to pay future medical and TTD based on a subsequent occurrence with no reporting of new accident, injury, or no reporting of a new aggravating event that occurred about sometime around March 9th. And the facts, they're irrefutable, say this gentleman knew he was under review because of his poor work performance which could have endangered the general public with his mechanic negligence. They were going to bring him in. He knew it. They asked to meet with him. They were going to meet with him. They did meet with him. And after the meeting, they gave him a reprimand and he sat in the cafeteria and a witness testified to this and he agreed. He's upset so he goes out and makes a phone call at about 5 o'clock to request that a fax off work slip be brought back into the employer by 6 o'clock, which it was received and placed on the desk without an examination, without any testimony. It wasn't a doctor that he spoke to, an unidentified staff member. We don't know credentials or anything. Would you just send me this off work slip? They do so. It starts the off work slip and it starts the benefit issues going. Are you telling us, you're representing to us that he claimed it called Gornet after as a result of being disciplined? Is that what you're telling us? They had a disciplinary review or a meeting with the managers that afternoon at 3 or 4 o'clock. Dave Loge, the supervisor, testified at the hearing and so did the petitioner. And he said that he encountered then the petitioner in the break area. Then the petitioner said he was going to make a phone call. He goes out, makes a phone call, comes back, tells Mr. Who did he call? He testified that he called Dr. Gornet. Gornet's office. Gornet's office then faxed in an off work slip for that Monday the 12th and they received it and they put it on the chair. But he called Gornet before he was disciplined. Claimant testified he called Gornet's office at 9.50 a.m. before his shift commenced at noon. So was he already disciplined or not before he called Gornet? He knew the discipline was coming, but they did put it on his... Now he knew it was coming. Well... You said it was after. Originally he was disciplined. It was after he was disciplined. The evidence is he did make their... They've submitted evidence of a cell phone call from his cell to Gornet's offices, the offices of orthopedic center. We don't have anything as to any note. We don't have... Counsel, your time is up. You'll have time and reply and may want to follow up on that. Thank you. Counsel, you may respond. May it please the Court, Mr. Leahy. My name is Mary Massa and I represent the appellee, David Summers. I think Mr. Leahy's arguments are geared towards the commission's determinations regarding credibility of my client. And in that regard, the commission found that my client's testimony was credible. In fact, in the decision of the commission regarding whether the injury arose out of the course of employment, it cited the petitioner's testimony. It cited Dr. Gornet's testimony, Dr. Lange, the IME, as well as the medical records presented by both petitioner and respondent. And the commission found that the petitioner's testimony regarding the events that occurred on the date of the accident, October 4th, 2011, were not refuted and are, in fact, supported by the medical records. Now, in this case, my client testified that he was on a creeper board putting a torque part. He's a diesel mechanic. I don't know. He had to extend his arms up. He, in fact, told doctors that he had to be in an awkward position. He testified and told doctors, treating doctors, that as he was holding it up there trying to get it in position, he felt a pop. He put his arms down. He waited ten minutes until he felt a little bit better. Then he finished that job. And then did he go home then? No. He went and he did the work on the other trucks that he was required to do that day, which included bending at the waist into the body of the engine of the truck and replacing hoses and whatnot. The incident report that opposing counsel seemed so tied up with that this is impeachment of my client, my client was referencing the last job that he had that day, working on truck 3002, I think it was. And he said that after bending over and changing hoses on that truck, he stood up and felt this discomfort in his back, which got worse over the evening, such that when he went to see his family doctor the next day, he mentioned that he had hurt his back working on trucks. Now, is that inconsistent with his testimony at trial? I don't think so. Can I ask a question? Yes, Your Honor. The proponent says that on pages 40 and 41 of the transcript we're going to find testimony in cross-examination where he testified there wasn't a pop. I don't remember that being in the transcript, Your Honor. Because the commission or the arbitrator found that he felt a pop in his back and immediately felt pain in his low back. He contends that in cross-examination the man said there wasn't a pop. I don't remember that being in the transcript, Your Honor. And I don't have that in my statement of facts. And I don't have my transcript with me. So I can't refute what opposing counsel says. But if that were true, I would have put that in my statement of facts. I would have tried to explain that away. But let's look at the course of treatment of my client. This wasn't just some discomfort that he had in his back after working on trucks that day, which was something he did every day at work. He was referred by his employer. After filling out an incident report the very next day, he was referred to their company doctor for initial treatment. That company doctor ordered physical therapy, which he went through, and after six weeks he still wasn't any better. The physical therapist says he's not getting any better. So their company doctor orders an MRI, which showed the disc herniation. And after that he was referred for injections to see if that would calm down the bulging herniated disc in his low back. It did not. He gets to Dr. Garnett. And Dr. Garnett also wants to treat him conservatively, orders more physical therapy. He went through all of this conservative treatment. And Dr. Garnett testified that with his microdiscectomy patients, which Mr. Summers was, it's his practice if they have some improvement with conservative treatment, physical therapy, injections, whatnot, he lets them do a course of unrestricted work, which is why he let my client go back to his job full time with no restrictions. That lasted a period of, I want to say, three weeks until March 9, 2012, when he was having so much trouble doing the full time work. Light duty work he could do okay, but the full duty work, it was hurting his back, he was having pain going down into his leg. And so he called, and we have evidence in the record that he actually called his doctor's office the morning before he reported for work and said, I might be... Well, he makes, you know, a big deal of that, and I wanted to pin that down. Because he implies that he, Clayman did that because he was retaliated for being disciplined. However, the Clayman testified he called Garnett's office at 9.50 a.m. before his shift commenced at noon. The commission found Clayman credible because his testimony was corroborated by telephone records as well as Garnett's records. Did he call the doctor's office before the shift began or after he was disciplined? He called the doctor's office before the shift began. So it's not true that he called after he was disciplined, is it? No. As I recall, the record indicates that Dr. Garnett's office contacted him that evening and said, hey, we're taking you off work. We're going to fax an off work slip to your employer. And, in fact, the supervisor admitted he did receive a fax that evening where Mr. Summers was being taken off work for his back complaints, his leg complaints. Didn't Dr. Garnett testify or was there a report or something that he had, Dr. Garnett had personally discussed this with someone at his office? Yes. That this decision wasn't just made by a receptionist or whatever? Yes, Your Honor. That was discussed in Dr. Garnett's evidence deposition. He was questioned and he said, yes, I have a physician's assistant, Ms. Jo Gerst I believe her name was, who actually spoke with Mr. Summers and I talked to her and we decided that we were going to put him on some, a course of steroids to settle the back down some, and then I was going to see him on the 26th of March. So Dr. Garnett acknowledged that this, he had a discussion with the physician's assistant who spoke with Mr. Summers that morning and the decision was made that he should be off work until he could be reevaluated. And at the time he was reevaluated on March 26th, Dr. Garnett took him off work. So this disciplinary thing had absolutely nothing to do with his phone call? I think it's totally a red herring, Your Honor. Red herring, maybe a little disingenuous, yes, okay. And Mr. Loge, the supervisor who had the disciplinary meeting with my client over for getting to put the cotter pins in on a job earlier that week, admitted that it was just a verbal type of reprimand, admitted that Mr. Summers was, other than this one incident, a pretty much perfect employee. He did his job, he did his job well, and he had no objections with him. So I think to say that Mr. Summers, the evidence, the manifest evidence, is that my client knew he was getting disciplined, and after he got reprimanded and he was angry about this, he called Dr. Garnett's office at 6, 7 o'clock at night to try to get an off work slip. It's just not supported by any of the evidence. I don't know how that could be a finding by the commission. I don't know how that could be a finding by you in reviewing that commission. What was he disciplined for? There was a particular mechanical job where he had to install certain parts into the machinery. He forgot to put in something called cotter pins. And he acknowledged that, or I believe in testimony he said that he was hurried that day and it was totally an oversight on his part. Nothing that was a big deal. He wasn't going to get fired because of this. Well, it can be a big deal. Something maybe was loose if there wasn't a cotter pin. And that's probably why Mr. Loge met with him to talk to him about it. But it wasn't a situation where this guy was messing up all the time and this was the straw that broke the man. It wasn't a continuous. Right. This was an isolated incident. He had a disciplinary discussion with his supervisor about it. I think he even grieved it actually with the union. But be that as it may, this was not a situation where my client was going to get fired. And so he preempted that by calling Dr. Garnett's office to get the off work for his back. And Dr. Garnett said that this is typical of microdiscectomy patients, that they'll go back to work in a full-time job and it just becomes too much farther back. I think he explained that the mechanical process of using your back in doing your job puts loads on the already herniated disc and aggravates it, makes it more symptomatic. And Dr. Lange actually agreed with that as being true, that quite often microdiscectomy patients do have difficulty going back to full-time work. Is this after or before microdiscectomy? I think Dr. Lange was examined a couple weeks before trial, so it must have been after. No, I mean, what we're saying is Garnett has this protocol of conservative treatment before he engages in microdiscectomy. Absolutely, absolutely. Because they want to find out if they're going to be able to do the job without the invasive surgery. And I think that's what all surgeons should strive for. But he testified that he finds it in his practice that oftentimes that conservative approach just doesn't work and they do have to go back in and do surgery. And Dr. Garnett testified that he believed another MRI should be done which would be more focused on the area at hand, which would help him to decide whether a microdiscectomy would be sufficient operative treatment of my client or whether there should be some more enhanced type of surgery. Dr. Lange agreed. I mean, Dr. Lange testified he didn't think he could diagnose a herniated disc from the MRI that had been ordered by the company Dr. Beck in November of 2011. But Dr. Lange did opine that this man's back was a mess, that he did have a problem and he did have a problem at L4-5. That was their expert that said that. And so I think the commission and what they cite in support of their finding on a rising out of and causation is absolutely supported by the evidence. And so we are asking you to affirm the commission's decision in this case. Thank you, counsel. Thank you. Counsel, you may reply. Thank you. Very quickly, it's page 45 when I cross-examined him on his statement and I said, okay, it's fair to state that the statement you wrote out, this day the event doesn't mention anything about feeling a pop in your back while you're on a creeper board or anything like that. No, not in the statement was his answer. So he didn't say there wasn't a pop, he just said it wasn't in the statement. Right, and I argued to the bench that he did say there was a pop two months later to a physician. So it is evidence in the record. That's a little bit different than what you told us before. You told us before that he admitted there was no pop. The only thing he admitted was there was no pop in the statement. Correct. If I left that impression, I'll retract that. You did. That's true. Secondly, the phone calls. No one's arguing the phone calls. He made them before that morning and he made one after the reprimand, exhibit 11. Okay, so? He made both. But even if he got fired, let's say he did something wrong and he got fired, he still gets his TTD under Illinois law. Well, doctor, the firing and his reprimand, what I'm using is an offer to show he had an ulterior motive to claim a re-injury as of the 9th that never occurred. And that's what's keeping him off. And that's my argument and the alternative in the brief. And very briefly here, what happened is he did make both calls. Dr. Lange says doctors don't do this. They don't give people off work slips without examining them. And they don't prescribe narcotics. That's not something we do in the profession. And I don't have anything to refute. I'm not saying it didn't occur. The calls did occur. The facts came in. We're saying that that's not proper protocol. Interestingly, they waited three weeks to get an appointment. And on the Saturday before that Monday appointment is when we have the surveillance of him lifting, loading, unloading a Kenmore washing machine in and out of a pickup truck and him testifying at trial, which we were unaware of because we're not allowed discovery depositions, that throughout this entire process, he is carrying and feeding and watering horses for his mom. That's not inhibiting his ability to work. All of which was testified to or brought up before the commission, right? Correct. And finally, Your Honors, the diagnostics, what I like to emphasize in these cases is where the physicians agree. Both physicians agree that the diagnostic studies in this test were of poor quality. They can't use them. So right now we're on speculation as to the nature and extent of his discondition because they don't have a reliable diagnostic study MRI scan. Let me ask you a final question. Yes, sir. Lange is your expert, right? Yes, sir. Did he or did he not state that if one accepted Clayman's history of the injury, it would suggest that his symptomatology was the result of a traumatic injury? Did he or did he not? He did say that. Thank you. Thank you, counsel. Both this matter will be taken under advisement. Lent disposition shall issue. The court will stand in recess until 9 a.m. tomorrow morning.